May I please the court? I'm Robert Brown. I am appearing for the appellants, the district attorneys of San Bernardino, Riverside, and San Mateo counties. With the court's permission, I would like to reserve five minutes of my time for rebuttal, although I do not think I will need my full time. Okay. Thank you. The district attorneys of California, perhaps more than anyone else, are committed to the rule of law in this state, and it is that rule of law which brings us here today. Because of a change in stature in the executive during the course of the underlying litigation of this case. The bulk of my career, the district attorneys and the attorney general have stood side by side in the prosecution and defense of those prosecution cases. In the past three years or so, I think it's fair to say that the governor of the state of California, who is a party in this litigation, and the attorney general, who is not a party to the litigation but is serving as counsel to the defendants and the appellees in this case, have departed from the rule of law. By that, I mean that there is a decided effort to deviate from California law in the pursuit of these cases. And it's for that reason that the district attorneys seek intervention. The four factors, as the court knows, of intervention are timeliness, whether there's a significant protectable interest of the party, whether the disposition of the case would impair or impede the interest of the party, and whether the current representation is inadequate. If I can interrupt, that was the issue that was presented to Judge Seaborg. He denied intervention, but recent events have potentially mooted the appeal. Could you address mootness before you get to the merits of the intervention question, please? Certainly. And there's actually two motions to dismiss filed by the attorney general with claims of mootness. Would the court like me to address both of them together or focus on one or the other? My fellow judges may want to hear both. I'm more interested in the second motion for mootness, the motion based upon settlement. Okay. Within the last month, the parties in the underlying litigation filed what they termed a stipulated dismissal. The position of the appellate in the case is really not a dismissal at all. It acts more as a consent decree. The parties have attached essentially booby traps to that dismissal that will bring new life to the underlying litigation and to the extent where it will actually expand the litigation, potentially expand the litigation, if the district attorneys pursue actions under California law as they are permitted to do. And so while the case ostensibly has been dismissed and the stays of execution on the inmates in question have been removed, the way that the dismissal is phrased and was signed off on by the district court, it really is still binding the district attorneys and will create further litigation in the future if the district attorneys enforce their interest in the case. Let me make sure I understand the nature of the dismissal and the nature of the, I'll call it, you call it the booby trap, I'll call it the stipulations. The complaint has been voluntarily dismissed without prejudice. If any of three things happen, the complaint is, quote, reinstated. And those three things, if I've got it right, that the government's, the governor's executive order becomes inoperative. Now, his executive order imposed a moratorium and it removed the protocol. So if I get neither of those two things happen, that's a triggering event. Second, the state defendants adopt an execution protocol. I assume, given the first condition, that probably means a new protocol because of the first one, reinstating the old protocol, that triggers. And then the third, and I think this is the one you were referring to, if a district attorney, a court, or another state representative notices a move or date of execution, then it goes forward. My question is this. If there had been no stipulation, that is to say simply a voluntary dismissal without prejudice, so a new complaint can be filed, if any of these three events took place, would a new complaint be filed in response to that? It could. Why is this any different? That is to say, this automatically reinstates the complaint. But if a new complaint could be filed in the event of any of those three things happening, why is this in substance any different from a voluntary dismissal without prejudice? Because the attorney general, in entering into the stipulation, has agreed to certain actions should the reinstatement occur. They have essentially opened the gates to all other Supreme Court cleared death cases to all their inmates who have had their review completed and will not fight the intervention of those inmates. And so cases that might have not been timely for a new complaint now will not face opposition from the attorney general. The implication is also there. I didn't understand that answer. Could you explain it a little further? Certainly. If an inmate, let's say in your scenario, a complete dismissal occurs. A complete dismissal of what occurs? If a complete dismissal of a case occurs with no conditions attached such as currently exist. Condition without prejudice. Yes, yes. If that occurred and a new case were to be filed, then there would certainly be timeliness questions about certain inmates joining in the proceeding who had not participated before. And what would those be? That is to say if an inmate is threatened with execution, I can't imagine that the statute of limitations would have expired. It's not a statute of limitations question, your honor. I think it is a timely pursuit of claims question. Where if an inmate slept on his or her rights over the course of time, then certainly there could be opposition to a new plaintiff entering into the picture. As opposed to simply the old plaintiffs that were part of the current litigation. I don't understand how that could be the case. If someone is threatened with execution under a protocol, I can't imagine that that person can't bring a lawsuit objecting to the execution by that means. They probably could, your honor. In fact, they undoubtedly could. But there would be various factors as to whether or not the attorney general might be able to raise arguments against that person. Could they necessarily bring that challenge in front of this judge? I mean, this case was re-springed back into life in front of this judge, correct? That's correct. And could they necessarily bring that challenge in front of this judge if the case is dismissed without prejudice? They could. It could be filed in front of another judge. It could be done in any of the districts in California. So it may or may not be. I don't know how the venue provisions work in California, but would it necessarily? I mean, there's venues in the United States where if you file, you know you're going to get a certain district court judge. Is that the case here that if this case was dismissed completely, you could pick this judge by filing in a specific spot? I don't know how much control the parties would have over which judge they would appear in front of. I certainly think that what you're suggesting, your honor, is a possibility that if you file in the same district, because of that judge's knowledge of the history of the case, I think there's a strong likelihood that it could come back in front of them. I know the rules in the Northern District very well. The related case rule would virtually guarantee that it would go back in front of Judge Seward. I assume that that would be the case, but obviously that's not up to the parties. Right. Did that address your question, your honor? Mostly. I'm still not satisfied that there's anything different in substance that's actually accomplished by this other than the fact that it is very quick. You don't have to file a new complaint, but I don't see how this changes the substance of the analysis. And I've got a related question to that, and that is, until one of these things happen, I've got a records problem. Well, I think that if the, this may sound like it's deviating from your question, but I'm actually attempting to answer the question. If the district attorney's intervention motion was well taken or should have been well taken at the time that it was entered before the district court, that is, if the district court erred in denying the motion, then a stipulated dismissal would have required the stipulation of all the parties. And the district attorneys would not have stipulated the dismissal as it exists today. Now, your honor listed three possible scenarios that would bring new life into this litigation or would bring the complaint back to life. And there's actually a second one. The second one that your honor described also has some bearing on the DAs. The obvious one clearly is that the DAs went into court and obtained an execution order. That was the third one that you spoke of. The second one dealing with the Department of Corrections and Rehabilitation also could have some sort of interaction with the DAs because the DAs, under the changes in California law, have the power to go into state court and obtain an order that CDCR institute a protocol and make itself ready for executions. That was part of the changes from Prop 66. And it puts in the hands of the DA the power to compel CDCR, where CDCR is failing to follow the law that currently exists. And so let me ask you a follow-up question to that. On the first scenario, in theory, could the DA sue and seek an injunction to stop the governor's order saying that they thought the order was altruistic? I'm not saying are they going to do it, but in theory, could they do that? I actually think that the better way to test it would be for the DAs to go into court and get an order for CDCR to do that which they are compelled statutorily to do. So you're saying option two is better than option one, but I'm asking, like, could they do option one? I suspect that they could. So if that's true, I thought maybe they could, but I'm not saying which one is a better strategy or whether they would or not. But if that's the case, and essentially it's not like you're saying the DAs have a – they have, like, a stake in each one of these three things that would bring it back to life. So I guess that's the question is if you – it seems to me like this was almost designed so that if you – and I guess I can ask your opposing counsel about this. But if you take any of the actions that you might want to take, go into court under option three or under option two or somebody – you or somebody else who's to try to take the governor, and if that's successful, then this action immediately springs back into life, ready to go. And now, in theory, I suppose you can – you weren't – your motion to intervene wasn't dismissed with prejudice, I don't think. So in theory, you can move to dismiss again – I mean, to intervene, but we're talking – I don't know why the district court judge would suddenly change his mind because they think the rationale will be the same. Then you have to go through the whole process, come all the way back, and we're talking about, like, a year's delay before you can – is that right or not? I agree with that, Your Honor. As part of the argument that I made in opposing the second motion to dismiss, I mean, one of the stated goals of intervention is for judicial efficiency and to involve all the parties who might have a stake in the proceeding at an early stage. Essentially, what the inmates in this case, the plaintiffs, FLEs, benefit from is delay. I mean, we're talking about a very decisive judgment that the only route that they can seek is to either delay or prevent that from occurring at all. We're talking about a further delay from something that has currently been delayed for decades. That all makes sense to me. Let me ask you, if you don't mind, about – you had mentioned earlier, and I think you're right, that if the district court judge had allowed your intervention, then – I think it's Rule 41 – you would have had a seat at the table and you could not have voluntarily dismissed the felon. But I think as Judge Fletcher was kind of getting out, that's kind of behind us now. I looked, and I couldn't really find any case law on what – there's case law that seems to say that you can – if you were wrongly denied an intervention, you're not necessarily mooted. But there's kind of case law going both ways. But what I couldn't find is a case where the case had actually been dismissed, the appellate court said it was wrongly denied an intervention, sent it back, and so what happens then? There's two parts to that question. Theoretically, whether – could you – can we send it back and say, undo the dismissal, since it was a voluntary dismissal and it shouldn't have been, and now I assume it would be like a contested dismissal? Can we do that? Can we kind of – can the district court judge undo the dismissal? That's the one question. The second question is, would you even want that, or do you just want an order from us sending it back so that now, if this case springs back to life, you immediately have a seat at the table? Well, I think that the second scenario is certainly one that might be more palatable than a complete affirmation of the court's denial of our intervention. However, I think that there's two avenues that I could see. If this court said that intervention should have been permitted and remanded the case back to the district court for proceedings consistent with intervention, essentially non-protonic back to when our denial occurred. And that is, number one, the DAs could argue that the stipulation is ineffective and therefore should be vacated because a party was not part of the stipulation. And number two, the Prison Litigation Reform Act, which should be governing some of this litigation, was not considered because there are two provisions of the Prison Litigation Reform Act that actually impact, I think, the stipulated dismissal. If I'm correct, that that dismissal was essentially a consent decree, because it has various factors of it that are not a complete dismissal, then I think it violates the Prison Reform Act's prohibition against consent decrees for this type of litigation. Secondly, there is a provision within the Prison Reform Act that allows for private settlements and says that that is not prohibited. This could be termed a private settlement as well. However, that provision says that they're only allowed if the only condition placed on it is the reinstatement of the complaint, which I assume would be the position of the penalties, that this would just be a reinstatement of the complaint. But this has other strings attached to it. It's more than just reinstatement. It allows other inmates to participate in the litigation, and it allows stays to be pursued by those inmates. And so it expands the universal litigation that was once fairly narrowly drawn. The attorney general had been opposing additional intervention by inmates over the course of this litigation. There were several that occurred during the last couple of years of the case where the attorney general, two new inmates or three new inmates attempted to intervene, and the attorney general filed opposition to it. They have removed that condition. And so because of that, I believe that this is not truly a stipulated dismissal. I hear what you're saying. It sounds like what you're saying is if we were to send it back, I wasn't sure whether you would just sit on the sidelines and say we're going to be a party if this thing comes back. But it sounds like you'd want to go back and essentially undo the dismissal and dispute the stipulation. Are you aware of any case law? It seems like there's case law that assumes you can do something like that because there is case law that says that an appeal from a denial of intervention is not necessarily moot because a case was dismissed. So that would seem to assume that you can send it back and sort of resurrect the dismissal. But I didn't find any cases where it actually did that, right? It just seemed to assume you could do that. Nor did I. I also was searching a great deal. As I listen to this argument, I'm becoming increasingly sympathetic to the notion that this is not moot on the ground that you're raising that had you been allowed to intervene, you would not have agreed to the stipulated dismissal. You would have been powerless to prevent a voluntary dismissal without prejudice, not pursuant to the stipulation because the plaintiffs in control of their own case. But you would have objected, you say, to this had you been permitted to intervene. And that strikes me as maybe a reason why this is not moot, even though I have trouble seeing how this stipulation and dismissal is very much different from just an ordinary, straight up, voluntary dismissal. Your time is going to run, but we'll make sure you get a chance to say everything you need to say. Could you address the merits of the intervention question? Certainly. I think that the district court's ruling in which Judge Seaborg denied our intervention got most of the factors right. The timeliness certainly is something that both sides of the palleys have objected to. But because of the change in California law, it really, to my view, meant that our time started running. I'll save you some time. I've got no difficulty answering the timeliness question. Okay. Judge Seaborg also said that we do have a significant predictable interest, that he recognizes that. But his quarrel with our intervention was whether or not the Attorney General properly or adequately represented our interests. And our position is that the Attorney General has not. What's your interest? The underlying issue in the case, even though this case has been going on for a very, very long time, the underlying issue in the case is actually fairly straightforward. The question is constitutionality of the method of execution. That's correct. You, the district attorneys, that's not your call. That's the state call. Well, and the district attorneys are state officers, Your Honor. Your call as to how the state will carry out the execution, once we have a valid conviction and a valid sentence, how that execution is carried out, you don't get to decide that. That's a decision by the state. What we do get to participate in is the abandonment of execution altogether, which is what purports to have happened. And the changes in the California Penal Code, specifically 3604.1, that were implemented by Proposition 66, does insert the DAs into the process of establishing and ensuring that a protocol is present and the methods of execution are pursued. And so I disagree that the district attorneys are not involved at all. So would it be accurate to say that, I mean, I think Jeff Fletcher is right in the sense of, like, you don't get to develop the, and if a method of execution is struck down, you don't necessarily get to develop. But it seems like Prop 66 sort of gave you a way to prod the process if some state actors aren't, that are the ones at the forefront of developing, that Prop 66 gave you an ability to prod them if you don't think they're moving. Isn't that kind of your argument? Yes, it certainly did allow the district attorneys to participate at a level that was not present before. And that was one of the reasons that intervention did not seem to be a proper path before. Now, because of that, the DAs are in a different position. And it certainly stems to reason that where the parties to the case, that is the governor of the state of California and the secretary of CDCR, have abandoned all attempts at executions and saying that will not occur, then the district attorneys are the ones that are tasked with making sure that the law is followed, as it currently exists in California. The governor does not have the power to simply wish away Proposition 66 that was voted on by the people. Let's assume that that's right. Why is all of that needing to happen in this case? I mean, this case was about the constitutionality of a particular protocol. That protocol is currently off the table. Your argument seems like your contention really is with the governor's policy about capital punishment. Why is this case the vehicle for that fight? Because don't we look at intervention in terms of what this case is about, and it seems like you're trying to morph this case into something new. Well, this case is proper for it because it is the stays from this case that were operating against the interests of the district attorneys. That is, the inmates that were part of the proceedings, who had their executions stayed by the district court, is what gave the DAs an interest in the proceedings. The fact that it appears to us that the complaint, as it existed in front of the district court, does not meet muster as provided for by the Supreme Court in Gloucester and the more recent case of Buckley v. Preside. There are avenues there that should provide a challenge for the existing complaint that have not been pursued, that should have been pursued, and, in fact, have not been addressed at all. Let me make sure I understand what you meant. I'm sorry, Your Honor. You're talking about avenues that weren't pursued, that the complaint should have pursued other things. I'm not sure I follow you. In the underlying proceedings, there was a plan by the existing parties for the plaintiffs to file an amended complaint following the California Supreme Court's ratification, for lack of a better term, of Prop 66. And the plaintiff's appellees, that is, the inmates, did that. They filed a Fifth Amendment complaint, I believe it was in February of last year, or maybe it was this year. The attorney general did file a motion to dismiss, which they had discussed in our briefings on the merits on this issue, but it did not address the Supreme Court's teachings in Glossop vs. Gross and the origins of that, which was Bayes, but Bayes was a plurality, whereas Glossop was not. It did not address the Prison Litigation Reform Act. You're referring to the complaint? Yes. And, instead, it based the dismissal argument solely on from the governor's so-called moratorium, which the district attorneys continue to believe is ineffective. That's not really the question for this court. And so there was litigation that should have been dispositive of the underlying district court case that was not pursued. I know that the appellees have both said that the district court considered and rejected the argument of Bayes, but if you really look at the order, it was relegated to a footnote. It did not really consider Glossop at all, and there was no analysis that requires the plaintiffs to properly plead their case, which they hadn't done. So, counsel, I want to make sure that I understand your answer to Judge Hunsaker's question, because I think maybe what she was asking was these rights that Prop 66 gives the DAs, right? They give them to the DAs, they give them to the victims, I think they give them to the AG's office, too. It's not necessarily those rights. I think that's a right you get to pursue in state court, in California state court. If you want to order the state, California State Act, or I forget her title, to act under the Prop 66 statute, you pursue that litigation, I assume, in state court. So you're not going to bring those claims in this case. But my understanding was that your argument was that because you have that ability to act independently of the Attorney General, you have this ability to vindicate those rights, that that gives you an interest in this litigation, because this litigation stands as a barrier to you being able to do that. And so if you're not in this litigation trying to move this stuff out of the way, too, then why would you pursue that? It's sort of like you'd have this independent barrier. Am I understanding correctly that that's sort of your argument as to what your interest in this litigation? It's not that you plan to vindicate those Prop 66 rights in this litigation. You're correct, but it is those rights that essentially give us, as the real party in interest, because it is our judgment that's being frustrated, the nexus to this litigation that we are pursuing. So I think you've summed it up correctly. And I see that my time has gone up to about three minutes. If there are other questions, I'm happy to field them. Otherwise, I would like to wait for my rebuttal. Can I have one more question? And Mr. Brown, when you're answering this question, don't worry. We will make sure you get a chance for rebuttal. So don't feel you have to rush your answer. Thank you. One of the things we haven't talked about, but is kind of a background issue and was briefed in the briefing, is I think California, like I was the Solicitor General in Nevada and Montana. And both of those states had these interesting provisions. So I worked for the state AG's office. And both those states, I think like California, had a provision that said the AG has supervisory authority over the DAs, something like that. And, of course, when I saw that, I thought, great, we're going to be able to tell the DAs what to do in the AG's office. And that turned out to not be pretty much what you thought it said. If I recall in Montana, I remember begging with the DA to do something and thinking to myself, well, I thought we had supervisory authority over these DAs. And if I remember, I came over to Montana and Nevada. They had case law that made it clear that that what sounds pretty like a broad grant of statutory authority was pretty limited. I think in one of those states, you couldn't, that the AG could tell you you can't, that the AG could order you to dismiss something, a prosecution, but couldn't actually bring a prosecution. It's limited authority. Is that similar in California? Let me ask this. Could the California AG order, I guess it's your boss, I think, the DA, unless you're one of the DAs. Could they order your boss to drop this lawsuit or drop this motion to intervene or not? I suppose they could try. I don't think they have the power to compel it. And I think there's, in my briefing, I included some language about what that means for the attorney general to have a supervisory role over the district attorneys. There is case law that pretty clearly spells out it doesn't mean that the attorney general gets to dictate the policy of the DAs or control their actions. And so I think it does somewhat draw a parallel. How would they do that if they wanted to? Would they bring a state court action asking for mandamus to have a state court order you to stop the lawsuit? Is that what they would do? I assume that if they had the authority to do that, that that would probably be the course of action after your petition for writ of mandamus. Since they have not done that, and it's now been getting close to three years since we have attempted to intervene, I'm assuming they know no authority that provides for that either. Or politically. I mean, having, or politically, they may not think that would be a good thing to do. I mean, but it's interesting because they're making the arguments kind of you don't have authority to do this. But I think they would have a route to pursue that if they either really believed it or believed it enough to go after it. Well, this actually, it sort of relates to something that the inmates suggested. About 36 hours ago, they filed a notice that one of the authorities they relied upon had been overturned. And the California Supreme Court case that overturned their prior site is Abbott Labs. It's in their recent filing. And I think it's important to note that there is some notation in passing in Abbott Labs that the district attorneys must be authorized, specifically authorized, to prosecute a civil action. And I think it's important to note that there's a list in the government code, the California government code, about the things that an attorney general, excuse me, the district attorneys can do. Some of which is civil. And I think it's important to note that, number one, the Abbott Labs case did not turn on that. It had to do with unfair competition procedure. But number two, DAs are not seeking to prosecute a civil case here. We're seeking to defend the civil case here. And so I think that's a distinction that kind of speaks to the question you're asking is whether or not the DAs have authority to be doing what they're doing. OK. Thank you. You are over time. We'll give you a chance to respond. Thank you. I appreciate that. So we've got two arguments, 15 minutes each, from the state and from the plaintiffs. I'm not sure which of you, but who wants to go first? Up to you. The state will go first. OK. If you can keep your voice up, please. Yes, Your Honor. May it please the court, my name is Nisha Iqra. I'm a supervising deputy attorney general. I represent Governor Newsom, Warden Davis, and Secretary Diaz. So Iqra, can I ask you, what do you think? Could your boss, the AG, the old part of me that used to work in AG's office kind of wants to hear that they could. But could your boss order these DAs to stop trying to intervene? Your Honor, that's not something that the parties have raised. And it seems to me that that's a delicate matter of the allocation of power between state and local elected officials. But it's really a matter for California state court. OK. So that would have to be something they'd bring in state court. But I guess the fact that they haven't done that, and I'm sure your plan addresses, but the argument that the district court relied on the fact that, well, the DAs are being adequately represented by the AG's office, that's kind of hard, at least as a practical matter. It's kind of hard given everything that's happened even since. This dismissal that seems to have three things that all spring into action if the DAs take any of the actions that are possibly available to them. It doesn't seem like you guys are on the same, heading the same direction. I would want, I would think if you were both parties in a different case, having the same counsel represent both parties would be an ethical issue. Well, Your Honor, to my knowledge, there hasn't been any motion to recuse the attorney general from office. No, no. But my point is just that isn't it hard that the argument that the AG is adequately representing the interests of the DAs, I mean, as a practical matter, it's tough, right? It's really tough. Well, Your Honor, I think that we need to look at two points in time. Mootness is described as standing on the timeline. And so the things that have happened since the intervention was denied, those are certainly relevant to mootness. However, an intervention motion under Lulak and Smith versus Marsh must look at the record as it existed at the time that the intervention was denied. And at that time, the attorney general's office and the defendants had been defending the protocols for years in many forums, bringing appeals, petitions for risk of mandate, defending actions in state court under the APA, defending this action, promulgating protocols. And so the record as it stood at the time of the motion for intervention, the district court decided on that record that the interests were being adequately represented. Now, as we move forward, we're talking about mootness. What has happened since intervention? And that goes to this court's jurisdiction. And that must be decided first, before we look at intervention. I've been rethinking my position on mootness as I move forward. The hard question for me now is not the mootness question. And I'm inclined to think it's not moot because of the argument that had they been permitted to intervene, they would have objected to this settlement. I'm much more interested in the merits of the intervention question. I've got a question for you on the question when you say, well, you look at the record in front of the district judge at the time the intervention motion was made and ruled on. That seems to me absolutely right. On the other hand, one of the things that's in front of the district judge at that time is not merely what has happened, but what could happen, and the possibility that the interests of the would-be intervener are not going to be properly represented. How would you respond to that? Yes, Your Honor. I believe we addressed that in our brief, that where we are looking at speculation about future events and that a favored argument may not be addressed in the future, that's not a matter for intervention. Because intervention is denied without prejudice. And if things turn out that there is an implication on a valid interest that is being unfairly impinged, then an intervener may then move once those things take place. But I believe the case is Blatchford that says, when intervention is contingent on future events happening, that something may happen in the future that would impinge an interest, that is not an appropriate consideration on appeal from denial of permission to intervene. And Your Honor, I would like to address your comment about the DAs wanting, if they had intervened, they would have objected to the stipulation. Your Honor, under rule of civil procedure 41A1A, plaintiffs were free to dismiss on their own without anyone's consent. But the problem with that is both procedural and substantive. Under 41B, that would have been deemed an adjudication on the merits. And we know that there has not yet been a determination that California has a protocol that satisfies the Eighth Amendment. Defendants haven't defended that protocol and believe that it does, but we do not have an adjudication on the merits of that issue. And so it was necessary so that no one would be killed with a protocol that violates the Constitution. It was necessary to make sure that there was a pause, that everybody goes to their separate corners. And once there is a protocol, they can come back and argue about whether or not it satisfies the Constitution. So really, this was just an acknowledgment by the parties that there's nothing to argue about right now. The governor has imposed reprieve through an executive order. No one is going to be killed under any protocol because one doesn't exist. And the DAs don't claim, nor can they, that they could have prevented Governor Newsom from imposing that executive order. And certainly, that makes their claim moot. As a matter of fact, this court's decision in 2010 makes that clear. In 2010, this court held that the district court should not have offered Albert Brown a choice between one drug or three drugs to be killed because there was only one protocol that had gone through notice and comment, and that was the only one that the state could use. Well, here, there is no protocol. So there is nothing that the state can use to kill the plaintiffs for their crime. Can't happen. Not now. And so what the stipulation for voluntary reinstatement does is it says, let's go to our separate corners. When there is something to argue about, this will come back, and we can pick up where we left off. Rather than waiting, and as the Supreme Court has said, they don't want people who are subject to executions to wait until the last minute to challenge the method of their execution. They would prefer a more orderly, reasoned process. And this stipulation for voluntary reinstatement allows that reasoned process. Now, I also would like to address Judge Van Dyck's comment about the cases and what they say about returning to a case that has been dismissed. And I think LULAC and United States versus Ford, especially LULAC at footnote one, makes it clear that when a case has been dismissed, the intervention issue becomes legal. But when a case has gone to judgment, it is not legal. Because had they become a party, they would have had standing to appeal. But when there is no action in which to intervene anymore, then intervention would be futile. And that is so clear. Are you familiar with the Sprint Communications case? I mean, that's a case from our court, Judge Berzon. And I think in that case, it involved a dismissal. And it said that the case was not necessarily moot. So there was denied intervention if it had been dismissed. Your Honor, I'm sorry. I'm not familiar with that case. I think that LULAC grew a distinction between United States versus Ford. But it says an intervention controversy can remain live even after final judgment is entered in the underlying case. Absolutely. It always does, but it can. And I think our case had a dismissal. And that's the distinction with Purcell versus Bank Atlantic and United States versus Ford. In Purcell versus Bank Atlantic, there was a judgment. And the intervention motion remained live because had the intervener been a party, they could then appeal. But because they were shut out, they could not appeal post-judgment. The difference in United States versus Ford is that there was a dismissal. And there was nothing to go back to. You would ask, Your Honor, whether you could roll back time and undo the dismissal. And I think that putting a one in LULAC makes clear the distinction between a dismissal and a judgment. And it sounds, Your Honor. That's not what our question is. I think you should look at Sprint Communications. Sprint Communications, Judge Berzon, said that the parties, we agree with the Fourth Circuit that the parties' settlement and dismissal of a case after denial of a motion to intervene does not, as a rule, move to putative and intervening objection. It sounds to me like you're trying to draw a distinction between a judgment and a dismissal. And I don't think that, I mean, under the Sprint Communications case in 2017, I don't think that distinction is the law in the Ninth Circuit. Your Honor, I think LULAC is the Ninth Circuit case, as is United States versus Ford and Purcell versus Bank Atlantic. I have to follow up on this point just to talk about these cases a little bit. So Sprint is where the person trying to intervene is trying to intervene as a plaintiff. Here, we've got a situation where someone's trying to intervene as a defendant. So Ford presents that circumstance. But in Ford, the dismissal was with prejudice. So the case was over and it couldn't come back. That's not our circumstance. So here we've got somebody who wants to come in on the defense side. We've got a case that's not live this moment but could be live again in the future. And doesn't that impact the mootness issue? No. I mean, I don't think that's part of the control of this case. That does impact the mootness issue slightly differently, Your Honor. That is that there's an exception to mootness when an action is capable of repetition but would evade review. And here, the stipulation for voluntary reinstatement ensures that this is not an issue that is going to evade review. This is something that can come back that will be reviewed by this court if intervention is attempted and decided. I'm not sure that completely responds to Judge Hunsaker's point. But I'm also not sure that this is not capable of repetition. Because in a sense, if you think of what happened here, your argument is essentially, hey, if this case comes back to life or when it comes back to life, then the DAs can try to intervene then. But they're going to be told they can't intervene then, I think, under the same rationale that the district court judge applied. Let's assume we disagree with the district court judge's rationale, because we're concentrating on your mootness argument. But the district court judge is probably not going to disagree with his own rationale. And then they're going to have to go through this whole process. And so a year or more will be eaten up. And then by then, you might do exactly what you did again. So how is this not capable of repetition? It's a similar type problem as you have in the capable of repetition but evading review type issue. Instead, why not put them in the case? And they're sitting there waiting. If we think that the district court judge's intervention rationale was wrong, put them in the case. They're sitting there on the sidelines. And it saves all of that problem. So, Your Honor, focusing on the second part, yes, if this is capable of repetition, would it evade review? And the answer is no, because they could come back to this court. And so there would be an avenue for review. It's not a circumstance like city of Erie versus Utah. I don't know if that's true, though, because I think some of the other, the three cases, the four, and then you have the two other cases that you said, I think one of those cases, actually, what happened if, while they're trying, they get denied intervention. While they're appealing that, the district court judge actually rules that the, whatever, the new, let's say it's a new protocol, right? The new protocol violates the Eighth Amendment. And then neither party appeals. And they're stuck in a, it'd just be evaded review also. Yeah, so in Sprint, I could see how that would be a problem because they weren't able to participate in the settlement nor able to get any of the settlement funds because they were plaintiffs. But here, the district attorneys seek to intervene on behalf of the defendants to defend a protocol that they have no part in promulgating. Well, as I said earlier, the problem, they actually do, under Prop 66, have a role in the protocol. It's not in the front end, but it's sort of in the back. But in order to vindicate that role, this is kind of standing in the way. You have two different blocks here. And if they can't play in this arena, then what good does it do for them to play in the other arena that Prop 66 affirmatively gives them? Because all the stuff will just be lost over here. Under their argument, it will be lost because you guys aren't fighting it effectively. And I mean, it looks a little bit like you're not trying to. I mean, the governor, who is your client, doesn't want to. I mean, I don't think it's pejorative to say he doesn't want to. He's made that clear. Your Honor, to clarify, this is a case about how plaintiffs will be put to death. This is not a case about whether CDCR is ready. This is about the method that will be used to put plaintiffs to death. And certainly, the district attorneys have the same interest as everyone on this call that when plaintiffs are put to death for their crimes, that the way they're put to death satisfies the Constitution. Everybody has the same interest there. The fact that Prop 66 exists and allows a mechanism to go to state court does not translate to an ability to intervene in this court concerning whether- But they're related, counsel. They're related. Because the whole point, I think, of Prop 66 is so that if a federal court judge, or it could be a state court judge, I guess, says that it violates the Eighth Amendment, and then the state defendants are like, well, if they stroke their hands and they don't do anything, a DA, as I understand it, can come into state court and say, you have to do something. Well, those two things are very related. I mean, they're sort of the next action you take. And that's what I mean by they're two different arenas. And if they don't get to play in this arena, then what good does it do for them to have been given this right to play by the people of California in this other arena? I'm not sure what they would play in this litigation. Well, their argument is that they'll make arguments and they'll appeal things that the state won't because the state doesn't want to have an- You say they're two separate questions, but let's be practical here. In this litigation, if it goes a certain way, if they don't want to execute people, in this litigation, if it goes a certain way, then people won't be executed. You can do things in this litigation that keep them from being able to be executed. So, I mean, I think we all know that. So, Your Honor, again, focusing on the motion for intervention and the denial of intervention, which is before this court, this happened in 2018, before the current governor. And a change in administration subsequently is not an issue that's before this court. This court must examine what was going on, what was before the district court in 2018. And at that time, the district's attorneys admit that the attorney general's office was making all of the arguments that they wanted to make. As a matter of fact, if this court were to look at excerpts of Record 125 with Ayala, the opposition to Ayala's motion to intervene in court today, the arguments concerning bails and lawsuits are asserted. Luteness, ripeness, asserted. Overbroad, I mean, the prison litigation format, asserted. All of the arguments that they sought to- I guess the judge, I hear your- I think we know you're a part of it. But the judge Fletcher's point you made earlier, I mean, obviously the DAs here, you know, seem to see something coming down the line. They're concerned about what could happen in the future. And it seems like there was some oppression because we all can agree at this point that the current administration, there seems to be a very significant disconnect between what the DAs want and what the current administration wants. So I think that was foreseeable. I mean, it must have been foreseeable that DAs wanted to intervene based on that. I don't think that in the summer of 2018, it was foreseeable who would be the next governor and what the next governor would be. It's foreseeable it might be, though. I mean, I think it would be. Judge Seaborg, at the time the motion was made, was there an argument made by the DAs that things may change, we may get a new governor? I mean, we're spinning out an argument that's now based upon what did happen. But I'm asking about what was the argument in front of Judge Seaborg with respect to the potential for a difference of opinion or point of view between the governor and the DAs? What argument was made in front of Seaborg? Yes, Your Honor. At opening brief, page 48, the district attorneys acknowledged that the defendants properly argued all of the arguments that they made. The DAs reasserted our arguments at supplemental excerpts of records 16 and 19. At excerpts of records 8 to 9, acknowledging that the defendants had made nearly every argument that there would be interveners raised. What they wanted is they wanted to bring motions for reconsideration of long-standing stays, and they wanted the Attorney General's office to take multiple appeals, which would just slow down the matter. So, Your Honor. So, I'm looking at the arguments in front of Judge Seaborg, this what might happen if we get a new governor who imposes a moratorium that doesn't really like the death penalty very much. That really wasn't presented to Judge Seaborg by the DAs. No, Your Honor, it wasn't. In their motion instead, they said that they criticized that appeals had not been taken when the court had made what they saw as erroneous decisions. Of course, they've got a problem with timing, not in terms of the intervention statute, but it had been more than 30 days since any of these stays had been entered. Some of them were entered in 2010 and 2013. So, their goal to appeal decisions or to seek reconsideration. Well, counsel, to that point, I mean, they could be saying there were past litigation decisions not to appeal. We're not saying we can appeal those things now. I think that's your point. But we think those kind of decisions are gonna come up again in this case if we want to be able to appeal them then. I mean, right, they could be saying that. That is not what they said in their motion to intervene. They were saying they wanted to appeal things that would be out of time to appeal? Yes, they said that their interests were with regard to plaintiffs Cooper, Deere, Brown, Fairbank, and Sully, specifically. And so, those stays had been in place for a very long time. Those five inmates, Cooper in San Bernardino County and the other four in Riverside and San Mateo Counties, that was their interest in the case. The people, specifically, that they had gotten execution judgments for. And this goes to Your Honor's point about what is the authority between the district attorneys and the attorney general. The Supreme Court certainly said the state has an interest in having its judgments carried out. But the district attorney for San Bernardino County is not the state. And neither is Riverside or San Mateo. Instead, the Supreme Court acknowledged in Fowler v. Duffy that the California attorney general is the highest non-judicial legal officer and has a duty to carry out the administration of its criminal laws. And so, it is the attorney general, according to the Supreme Court, that carries out these laws. Not the individual DAs from three out of 58 counties for five out of 24 plaintiffs. Your Honor. You're well over your 15 minutes and Mr. Garley is getting extremely nervous. If you've got something to say in 30 seconds, please do so, but we need you to sum up. Thank you, Your Honor. The reprieve on the executions, the absence of the death protocol, the fact that the case has been dismissed, all remnant of this case moved, there is no jurisdiction to even decide the issue. But if this court goes to intervention, it should find that at the time, in 2018, the defendants were adequately defending the death protocol. And this court should affirm. Thank you. Okay, thank you. Could the court please put 15 minutes on the clock? Okay, Mr. Garley, that ought to ease your mind a little. Thank you. John Garley on behalf of Plaintiffs Appellees. May it please the court. I want to add one more jurisdictional issue that we raised in our briefing and it was the DA's obligation to rebut and establish standing and they did not. And now that we have them staying here saying they want different relief than what the Attorney General wants, that triggers under Town of Chester an obligation of this court to address standing in this case. It also is triggered by the effect of a dismissal. There's nobody standing before this court other than the district attorneys who want the relief that they want. They don't appear as defendants joined at the hip with CDCR anymore, at least that's their argument. And to the extent it is their argument, they no longer have standing in this case. And Judge Van Dyke spoke about a very interesting issue in this case that I understand my colleague at the Attorney General may not necessarily want to delve into deeply, but we're certainly free to do so. And that is what are the respective authorities of the Attorney General and the district attorney? And that is key to the standing issue because as Hollingsworth says, and Hollingsworth was a California case, it clearly states, and we quoted it in our briefing, it clearly states that the Attorney General is the only representative capacity for state entities that have standing when the state is sued. It is- Let me jump to what I think is probably their strongest standing argument, which is this Prop 66. And I don't remember the statutory number on Prop 66, but the statute that was added that says that they have the ability to bring this lawsuit. And it actually has the DA or the Attorney General listed separately. It seems like the people in passing that provision wanted to make sure that if the DA didn't do it, I mean, if the AG didn't do it, then either a DA could do it or if I remember right, it also has victims or something. There was a lot of discussion about that provision, which was thrown in the reply brief by the DA as a basis for their argument, which I think is somewhat improper. But anyway, it's here. And ironically, that is the very statute that the Attorney General and the Governor and the Department of Corrections made sure could be effective by the reinstatement provisions. That is exactly what the reinstatement does, is make sure it protects that interest. That interest is a very narrow interest. It is an interest to appear in state court and state court only. How does it, I'm sorry, how does it, I'm not funny, you say the reinstatement and implications spring back to life from the dismissal. It protects that interest. Absolutely, it protects that interest because it says nothing in this reinstatement prevents them from going and getting a protocol. The biggest grief about the case is, as I could see. But doesn't that make clear that the reinstatement is related to the, I mean, now it seems to me that supports the idea that the reinstatement is related to this provision. But that's not the standard, whether or not something is related. The standard is whether or not there is any authority for the District Attorney, statutory authority for the District Attorney to appear in federal court for state entities. That's the standing question. It's not whether or not it's related somehow, it's whether or not what the authority is. And your Honor asked about what the state law is in this venue. The state law is very broad authority on behalf of the Attorney General expressed very broadly in the Domenico case, which we cited in our brief. It is the sole entity entrusted with defending the state as a party, according to Government Code 12512. In SAFER, the case we cited, they're very clear. There has to be specific legislative authority for the District Attorneys to appear in civil cases. And there is no specific legislative authority for them to do so. And they have been asked about this and asked to describe this time and time again. And they have not been able to point to a single statute that gives them that authority. Under Hollingsworth, that is dispositive. There is no standing in this case. Standing may have been a question when we did the original briefing, but it is determinative now that standing is a question. The circumstances of the case have rendered it such that the District Attorneys no longer have standing. That is why the reinstatement allows them to do whatever they want to do in state court.  that there's some sort of conspiracy between the governor's office and plaintiff's counsel. When the governor made sure that that interest was protected in this reinstatement, and that was the nature of the bargain. The cases are dismissed, the stays go away, the DAs can go to state court where they belong with all of the grievances they've brought to this court, including the governor's retreat, which they haven't laid a finger on yet in state court. That was the bargain. They can do what they need to do, but we're gonna make sure we have orderly review when it's done. And that orderly review is exactly what this court ordered in 2010. It's a temporary review. It's a temporary mechanism to allow the district court sufficient time to review the record in this case, which is massive. And the constitutional violations in this case, which were endemic to the process. It's not just a protocol. It's not just what the drugs are. It's people who didn't know what they're doing. It's people who didn't have the right drugs. 66% of the cases in this case had not had properly applied sedatives. I mean, there is no record like this in the country and the district court recognized that. It needs time to review whatever procedure they come up with and make sure that the problems that were identified are remedied. That's what it needs. That was the bargain we made and it's a perfectly legitimate bargain and protects every interest that the DA has come here for. They have no standing at all whatsoever at this point. Mr. Greenlee, do you think there is really an issue, is not a persistent intervene is legally a somewhat different analysis from standing to bring suit as a plaintiff. So we looked at rule 24 for standing to intervene. Well, you know, there's been a lot of discussion about that. A lot of discussion about the standing issue in relations to intervention. Can you keep your voice up, please? I'm sorry? Could you please keep your voice up? I'm sorry. There's been a lot of discussion about that issue. It's a live issue in the courts. We laid out some of the background in our briefing, but what it comes down to according to town of Chester is if an intervener is taking a different position from one of the parties in the case, that intervener needs standing to do so. And that is very clear. And now we have a dismissal. There's also case law, not in this circuit, but in other circuits, that that dismissal also triggers the requirement that they come forward with standing. We have a United States Supreme Court case on standing directly on point in this case and is dispositive of this issue. I also have a question for you. Sure. So let's say that the district attorneys are allowed to intervene. Given the current posture of the case, do you think that they have a legal mechanism to undo the sentence? No, because none of the aspects of the settlement are right for them. They don't have any ability to challenge the reinstatement provisions. They are not right. They may become right, at which point they may be able to challenge them, but they are not right right now. So they don't have any mechanism to go forward with that. Now, I noticed that they argued in their response to motions to system number one that the absence of a protocol and the reprieve do not render the case moot. So I'm always very, when I read the briefing, I was questioning, what does a true dismissal mean? They want a true dismissal. On what grounds? On what basis? You know, this is always the same stuff that we get. And it's just, I would like to hear, what basis is the motion to dismiss going to be made? Because if it's dismissed because there's no protocol or reprieve in effect, they've already staked out a position that that does not render the unlawful case moot, or it doesn't render it moot. I don't understand how they can go back to district court and say it does render it moot. And that issue's been decided three or four times by the district court already, that it doesn't render it moot. So I don't know where the district attorneys are coming from and where they're going, and I wish it was in their briefing. I would be able to respond to it better. You know, it seems very vague and unconcrete, and I don't have an idea of how to respond to it. When I look at the intervention motions that were made in the briefing in this court, first they wanted to intervene to challenge the stays. Those are gone. Then in this court, they came with a different approach. They want to move to dismiss. It is dismissed. Then in the reply, they wanted to be able to invoke their rights under 3604.1c. They have those rights. They're guaranteed those rights. Everything that they have wanted, everything that they claimed gave them the right to intervene has been given to them. Under the settlement that we agreed to with the attorney general's office, they, attorney general, who is the sole representative of state entities, made a very, very cautious and concerted effort to make sure that those interests were protected in the settlement. And I find it ironic that they come here today to try to undo something that gives them the very rights they seek. And those rights are limited. So counsel, why do you think they're doing that then? I mean, I don't think they're... I know why they're doing it. I can tell you why the real reason why is they want to accelerate federal review on the back end, which they've tried to do many, many times. They tried to do it with Albert Brown, who was almost executed unconstitutionally. They tried to accelerate review for Mr. Fairbank by going to state court, even though injunctions were in place. They've done it time and time again. And that is why. They want to accelerate federal review. Okay, so I think we know why they want it. That sounds right to me. And that seems like an interest that they have in this litigation that the state doesn't have. I mean, we pretty much know the state doesn't have it, because at least currently, the state doesn't want to have any executions at all. Well, I don't know that that's true. I think CDCR is doing what it can do to be able to get a protocol in place. I don't see anything different from any of the litigation, but I don't think that truncated federal review is a legitimate interest. It's not a legitimate interest. And this court has already made that determination. It's already set a morality case. The district court review cannot be superimposed upon it with these state procedures that force it to be unable to conduct the necessary review that is required in this case. That decision- Here's a question I have, and that is the DAs have various interests, but not all of the DAs' interests are an issue in this litigation.  and certainly was it an issue in this litigation at the time the motion was made and decided was the constitutionality of the protocol. That was the only thing at issue. So yes, they may have an interest in accelerating executions, and they have all kinds of interests, but I don't see that those were interests at issue in the litigation at the time the motion was made and decided. They're not expressed, and they didn't exist at the time, but Judge Van Dyke wanted a real-world political view of what's going on here. I understand the question. I understand your answer, Trisha. Maybe I didn't understand it then because I thought you meant to make sure that if and when this springs back into life that they want to accelerate the review in federal court. Is that not what you were saying? Were you saying something else? Yes, they want to be able to litigate under warrant. They want to be able to do it only within the 30 days that they get under warrant, and that is, first of all, it's not an interest that they have in federal court, and second of all, that's an interest that this court has already said is improper. And so that mechanism is no longer available to anybody, but it wasn't planned. It wasn't articulated, and it's really not an interest at all. We've already been down that road in this case. It's not a road anyone wants to go down, at least the parties in the court want to go down one again. These days reflect that. The court had filed for judicial notice. The court has an additional piece of evidence reflecting the problems associated with that process and that procedure. They're grave and serious, and any reasonable court has within its power the authority to administer a case in a way that balances the interests of the parties involved and does so in an expeditious manner. And the court district court has always said, it is my intention to do this case as expeditiously as possible. And having been in front of Judge Fogle and having been in front of Judge Seaborg for 14 years, that is exactly what they've both done. I mean, if you look at the record in this case, look at what Judge Fogle did. He gave them every opportunity to execute, every opportunity. Much to my chagrin in many cases, but everything he could to get the review done that needed to be done in an expeditious manner, any basis of saying that the district court is going to do anything different upon when review actually has to occur. In closing, the district attorneys can go and do what they want to do, recognized by the parties of legitimate interest. There was a glitch in the stage. It had language in them that required that preventive preparations, that is removed so that they can do what they want to do. We have made a bargain. It's a legitimate bargain. There's no reason to undo that bargain. It is a strong affirmation of the competing interests that have been recognized by this court and by the state and plaintiffs. And so to come in and say, I get to object and I get to do it over again, so it's exactly why they don't have any interest to intervene in this case. Okay, thank you very much. Mr. Brown, why don't we put three minutes on the clock to give you a chance to think about it. Sure. I think that there's irony in referring to the dismissal as protecting the interest when it is those very interests that are being frustrated by the way the dismissal was characterized because it will spring the complaint back into life. To answer the question that was put to the court by counsel, the answer lies within our opening brief. The DEAs believe that the plaintiffs in the underlying case, that is the inmates, have failed to properly plead their case. And a review of the Fifth Amendment complaint shows that they have not met the gloss of standard that is required. Instead, they have raised a religious objection to what is required by glossary. And so what the DEAs purport to do is to move for a dismissal of the complaint and the case. I'm pleased to hear a reference to what has occurred as a settlement because that is exactly what has occurred. There is something being given up here and the DEAs are the ones that are suffering for it. The Attorney General referred to the, excuse me, counsel to the Attorney General, referred to the Attorney General himself as being the ultimate authority for law enforcement in the state. The California Constitution tasks the governor and the Attorney General with ensuring that the laws are followed in the state. And yet, both of them are actively seeking to ensure the law is not followed. In fact, the governor, who is a defendant, has directed the Secretary of CDR, who is another defendant, to disregard the law. I don't see how that's not a conflict with the Attorney General. And it flabbergasts me that the Attorney General can represent himself as the ultimate authority of enforcing the law when it's the law that the Attorney General is seeking to support. Both parties talk about the time for reviewing these things. These cases have been reviewed for more than 30 years. And if there is a failure of pleading to properly put the issue in front of the district court, then that should be addressed now because delay only serves the interests of the inmates in this case. Delay is what this is all about. No one else may remember the victims in this case, but we do. District attorneys remember. We do not make further delay if they're in this case. And I ask this court to reverse the district court. Thank you very much. Okay, thank you very much. No further questions from the bench? The case just argued is now submitted for decision. We thank counsel, and we are now in adjournment. Thank you very much. Thank you, counsel.
judges: W. Fletcher, Hunsaker, Vandyke